IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOANNE DALLEY,                              No C 00-01687 VRW

    Plaintiff,                          ORDER

    v

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

_____/

        Plaintiff appeals from the final decision of the Social Security Administration (SSA) denying her application for supplemental security income (SSI) benefits for the closed period of August 20, 1996 through June 30, 1998. Plaintiff's chief complaint in support of her claim for benefits was migraine headaches. The parties have filed cross-motions for summary judgment. For the reasons stated herein, the court finds errors committed by the Administrative Law Judge (ALJ) require remand to the agency for further evaluation.

# I

## A

Plaintiff was born on January 8, 1953, obtained a high school education and worked as a bank teller until 1980. Administrative Record (Doc # 10) (AR) at 37-40. In July 1998, she resumed her work as a bank teller part-time. Pl's Motion (Doc #11) Att A, 1[1]. The period of alleged disability at issue on this appeal occurred before her return to the workforce.

In March of 1980, after the birth of her son, plaintiff began seeing Dr Carl Watanabe, a general practitioner (AR 77), for headaches; he referred her to neurologist Dr Thomas Harter. AR 43, 95. According to plaintiff's testimony, between 1980 and 1990 plaintiff raised her son and helped take care of her father, who had Parkinson's disease. AR 42. Plaintiff's headaches became more severe in 1990 and required her to stop assisting with her father's care. AR 43. During these years plaintiff's son began helping to take care of her. AR 46. By age "16 [when] he got his license[,] he was running the household, doing all the errands and groceries and taking care of [me]." Id. After the headaches further intensified in 1996, Dr Watanabe again referred plaintiff to Dr Harter, whom she saw "two and three times a week." AR 42-44.

Plaintiff stated in her Disability Report, submitted with her application for benefits, "when I have the migraine headaches, I basically am unable to function. It could last as long as 5 days." AR 76. Plaintiff stated that her medications caused upset stomach,

---

[1] The administrative record provided by defendant omits pages 3 and 4 of the ALJ's decision. The missing pages are in the court's record as attachments to plaintiff's brief: Pl's Motion Att A (Doc # 11) at 1-4.

**2**

sleepiness, dizziness, inability to focus and increased difficulty to remember. AR 76, 98, 108. When referring to Dr Harter's treatment, plaintiff stated: "my pain from migraine was so bad [] he had to give me two kinds of shots. I was unsuccessful with the medicine he gave me." AR 95.

In August 1996, Dr Harter wrote a letter seeking to have plaintiff excused from jury duty because she "has severe migraine which is not under control at the moment." AR 151. Two months later, in October 1996, plaintiff sought urgent care for lower abdominal pain; possible fibroid tumors were noted. AR 174. While seeing Dr Harter, plaintiff also attended eighteen medical appointments with Dr Watanabe in the ten-month period from December 26, 1996 through October 31, 1997. AR 239-45.

On February 22, 1997, in connection with her SSI claim, plaintiff was referred for a psychiatric consultation with Dr Richard Mark Patel of the Eastview Medical Group (EMG). AR 137. Dr Patel noted plaintiff's "numerous medications" including: Verapamil, Triamterence HCT, Lanoxin, Triavil, "PRN medication for migraines and headaches," Tylenol with codeine, Fiorinal and Compazine suppositories for cramps. AR 140. Dr Patel noted that plaintiff "does her own shopping, cooking, housekeeping, provides her own transportation by private or public means, does pay her own bills, and does take adequate care of her personal hygiene." AR 139. Dr Patel found plaintiff somewhat depressed and anxious, but found her ability to function largely intact, including in "work or work-like situations." Id. Finding her able to relate and interact with coworkers and supervisors and to remember, understand and carry out instructions, Dr Patel noted that plaintiff's ability to deal

3

with the public "may be slightly hindered due to her nervous affect" and wrote "the patient's ability to withstand the stresses and pressures associated with day-to-day work activity is where the patient displays her largest deficits, being easily brought to tears and becoming very nervous when asked to perform certain tasks." AR 139-40. Dr Patel's diagnoses included: (1) possible major depressive disorder with anxious features, chronic dysthymia, medication-induced depressive disorder, NOS, and some degree of somatization; (2) possible dependent personality disorder; (3) patient self-report of migraines; (4) "psychosocial stressors are mild to moderate: physical complaints of headaches; financial"; and (5) global assessment of functioning (GAF) of 60. AR 140.

In March of 1997, plaintiff saw Dr Satish Sharma for an internal medicine consultative exam at EMG. AR 141-44. Dr Sharma noted plaintiff's headaches to be "frontotemporal, throbbing, sharp, and associated with nausea * * * on the average [plaintiff] gets headaches once a week * * * [and] sometimes she has to go to the emergency room to get injections such as Demerol for relief of her headaches." AR 141. This report does not make note of any other complaints besides migraine headaches. Dr Sharma's functional capacity assessment noted no limitations in sitting, standing, walking, bending, stooping, holding, fingering, feeling objects, lifting, carrying, pushing, pulling, speech, hearing, or vision — in short, no physical limitations of any kind. AR 144.

In March of 1997, agency doctors reviewed plaintiff's record and completed assessments finding plaintiff minimally limited. On a Psychiatric Review Technique Form (PRTF), AR 116-25, a reviewing agency physician checked boxes for "impairment[s] not

4

severe" and "affective disorders," AR 117, "disturbance of mood, accompanied by a full or partial manic or depressive syndrome * * *." AR 119-20. Limitations in the form of "restriction of activities of daily living," "difficulties in maintaining social functioning" and deficiencies of concentration, persistence or pace were marked "slight," while "episodes of deterioration or decompensation in work or work-like settings" was marked "once or twice." AR 124.

On a Physical Residual Functional Capacity Assessment (PRFCA) form, AR 126-33, reviewing agency physicians marked boxes indicating no established exertional, postural, manipulative, visual, communicative or environmental limitations. AR 127-31. The form also indicated that its conclusions were not significantly different from "treating/examining source conclusions about the claimant's limitations or restrictions" in the file. AR 132. The March 1997 assessments were affirmed by other agency doctors. AR 117, 126.

On July 11, 1997, Dr Harter wrote:

> [P]laintiff gets daily headaches now. They are bitemporal usually and mild. When she gets a severe migraine, she has visual scotomata in the peripheral vision bilaterally associated with a unilateral throbbing headache, usually in the temples, photophobia, retching, and nausea and vomiting. These are related to her menstrual cycle in that they usually start with ovulation and continue on through the last half of the menstrual cycle until menstruation.

AR 149.

From July 1997 to May 1998, plaintiff continued her treatment with Dr Harter, attending twenty-five medical appointments. AR 152-53. Plaintiff reported the occurrence of

5

headaches at twenty of the twenty-five appointments.  Id.  Of the twenty appointments which mentioned headaches, six resulted in a notation improved/somewhat controlled headaches.  Id.  Each record of improved/somewhat controlled headaches occurred before plaintiff's surgery on December 17, 1997.  Id.  During the period from July 1997 to October 1997, Dr Harter also noted that various medications caused leg swelling, sweating and sleepiness.  Id.

In the fall of 1997, after unsuccessful treatment to control the migraine headaches, Dr Watanabe referred plaintiff to Dr Lisa Keller, a gynecologist, to discuss a possible hysterectomy.  AR 47 and 160.  Dr Keller listed plaintiff's current medications as Lanoxin, Dyazide, lisinopril, Triavil, Cardene, and "intermittent Motrin, Tylenol with codeine, or Vicodin."  AR 209.  In addition to the migraine headaches, Dr Keller found plaintiff to have a rapidly growing uterine fibroma and determined that surgery was appropriate.  AR 188.  She wrote that there were "two indications for surgery including quite symptomatic uterine leiomyomata and menstrual cycle related migraine headaches."  AR 210.  On December 17, 1997, plaintiff underwent a total abdominal hysterectomy and bilateral salpingo-oophorectomy.  AR 167.

On January 7, 1998, plaintiff reported: "has had headaches but not as bad —— feels significant improvement."  AR 159.  But on May 19, 1998, Dr Harter wrote plaintiff's migraine headaches were "refractory to medical amelioration * * * [and] her headaches are her only hindrance to gainful employment."  AR 147.

Meanwhile, plaintiff had applied to work at Wells Fargo Bank but although "they were ready to take [her], [she] had to wait" because of she had broken her foot.  AR 48.  Towards the end of July

6

1998, however, the bank hired her. AR 48-49. In September of 1998 clinic notes reported that plaintiff "still has headaches but now has a job and feels good at work." AR 156. As of the time the complaint was filed, November 9, 2001, plaintiff was working at Wells Fargo Bank twenty hours a week. AR 38.

B

On December 22, 1996, plaintiff applied for SSI benefits. AR 218-21. On December 24, 1996, plaintiff also applied for disability insurance benefits under Title II.[2] AR 70. On April 2, 1997, plaintiff received notice that her claim for SSI was denied based on the EMG psychiatric and internal medicine reports dated February 27, 1997 and March 19, 1997, respectively. AR 223-26. The notice of determination stated:

> [T]he medical evidence shows that though you may have migraine headaches, they are not of such frequency or severity as to significantly interfere with most normal activities * * * [t]hough you may at times be depressed, you are able to act in your own interests.

Id. Plaintiff requested reconsideration, following which the SSA reaffirmed its denial. AR 61-63 and 228. Plaintiff's "migraines can be controlled with treatment. While [plaintiff] may experience some discomfort, this should not prevent all work-related activity." AR 63.

Plaintiff requested a hearing, which took place on February 23, 1999. AR 11. Plaintiff was accompanied by an attorney. There were no other witnesses. During the hearing,

---

[2] Plaintiff later moved to dismiss her claim for disability insurance benefits. The ALJ refused, instead denying the claim based on a finding that plaintiff had no "severe" impairment prior to the expiration of her insured status in 1985. AR 12. Plaintiff did not appeal this ruling.

7

plaintiff testified that her migraines were "excruciating," "so bad that [I] would just lay there and it would hurt for a tear to roll down my face * * * I had vomiting * * * after I was done vomiting I would have dry heaves, just convulsing, dry heaves sometimes every 20 minutes for 24 hours." AR 45. She further testified that the hysterectomy had alleviated her headaches: "I don't have these headaches that last a week anymore, two or three days. I can think. I'm not medicated. I can work now. It was impossible before. I couldn't even fathom trying to work back then." AR 47.

On April 16, 1999, the ALJ issued a decision denying plaintiff's SSI claim based on a finding, at step three of the five-step sequential analysis (infra), that the medical evidence established that plaintiff did not have a "severe" impairment during the claimed period of disability and was therefore not under a disability at any time through the date of the decision. Pl's Motion Att A, 4.

The ALJ explained his decision thusly:

> There is no medical evidence which would suggest the need to restrict the claimant's activities in a routine work environment. Therefore, during periods of no-work when the claimant alleges disability, she cannot be found to have had a severe impairment. She is not shown to have any impairment or combination of impairments which was anything more than slight or having more than a minimal effect on her ability to perform basic work activities.

Id at 2. The ALJ accorded substantial weight to the opinions of the non-examining agency physicians as set forth in the PRTF and PRFCA reports. Id at 4.

The ALJ apparently afforded little or no weight to plaintiff's treating sources. Regarding the records from

8

plaintiff's neurologist, Dr Harter, the ALJ stated that he "cannot reasonably infer limitations from the records." Id at 3. The ALJ made only passing reference to the records provided by plaintiff's treating physicians, Dr Watanabe or Dr Keller, describing the care they provided, presumably including the hysterectomy, as "minor." Id. He concluded: "None of these sources indicates anything of significance that would lead to a finding that a 'severe' impairment existed during the period in question." Id.

Regarding the consulting examiners' reports, the ALJ noted that consulting internal medicine specialist Dr Sherma "found [plaintiff] to be without restrictions, despite her history of migraine headaches." Id at 3. He found Dr Patel's report, which he discussed at some length, not to support a finding of psychiatric impairment. Id at 3-4.

In support of his general finding that the "claimant's testimony was not credible to the extent of establishing work-related restrictions," id at 4, the ALJ commented, inter alia, that: "[h]eadaches are not shown in the medical evidence to be of a severity to account for her allegedly dysfunctional state during the period at issue"; plaintiff's MRI showed no abnormalities; plaintiff "had only routine office visits without the need for stronger medications administered in an emergency room setting"; and plaintiff "was tried on various medications, with some degree of success, according to Dr Harter * * * [but] functionally limiting medication side effects are not shown." Id at 4-5.

The ALJ's OHA Psychiatric Review Technique Form (OHA-PRTF) marked boxes showing affective disorder and somatoform disorder as present. AR 14. When describing the affective disorders in section

9

C of the OHA-PRTF, the ALJ marked "depressive syndrome" and "unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury" as absent, but marked "symptom magnification" as present. AR 14-15. The ALJ also noted slight "restrictions of activities of daily living" and slight "difficulties in maintaining social functioning." AR 15.

Plaintiff appealed the ALJ's decision to the SSA's Appeals Council, which denied review. AR 3. Plaintiff then filed her complaint seeking judicial review of the SSA's decision. Doc #1.

## II

### A

Under 42 USC § 405(g), a decision to deny benefits may be overturned if it is not supported by substantial evidence or is based on legal error. Thomas v Barnhart, 278 F3d 947, 954 (9th Cir 2002). "Substantial evidence means more than a scintilla but less than a preponderance." Id. "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Id. Where the evidence is susceptible to more than one interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld. Id.

"Disability" is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 CFR § 416.905.

10

To determine whether a claimant is disabled and entitled to benefits, the SSA conducts a five-step sequential inquiry. 20 CFR § 416.920. Under the first step, the ALJ considers whether the claimant is currently employed in substantial gainful activity. If not, the second step examines whether the claimant has a "severe impairment" that significantly affects his or her ability to conduct basic work activities. In step three, the ALJ determines whether the claimant has a condition which "meets" or "equals" the conditions outlined in the Listing of Impairments in 20 CFR Part 404, Subpart P, Appendix 1. If the claimant does not have such a condition, the ALJ proceeds to step four, which assesses the claimant's residual functional capacity and asks whether the claimant can perform her past relevant work. If not, the ALJ moves to step five, which considers whether the claimant has the ability to perform other work which exists in substantial numbers in the national economy. 20 CFR §§ 416.920(b)-(f).

The regulations do not directly define "severe," but do define a "non-severe impairment" as an impairment or combination of impairments that "does not significantly limit your physical or mental ability to do basic work activities." 20 CFR § 416.921(a). Social Security Ruling (SSR) 85-28 states that a finding of "not disabled" at step two is appropriate "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work * * *."

Even if, at step three, the plaintiff cannot establish disability based on the listing of impairments, a claimant can make out a prima facie case of disability if she proves, in addition to

11

the first two requirements, that she is not able to perform any work that she has done in the past. Thomas, 278 F3d at 955. If the claimant makes out a prima facie case, the burden shifts to the Commissioner to establish that the claimant can perform a significant number of other jobs in the national economy. Id. The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines at 20 CFR Part 404, Subpart P, Appendix 2. Id. If the Commissioner meets her burden, the claimant has failed to establish disability.

The social security regulations distinguish among the opinions of three types of physicians: (1) treating physicians; (2) non-treating examining physicians and (3) those who neither examine nor treat the claimant. 20 CFR § 416.927(d); Lester v Chater, 81 F3d 821, 830 (9th Cir 1996). As a general rule, more weight is given to the opinion of a treating source than a non-treating one. Id. Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing reasons." Baxter v Sullivan, 923 F2d 1391, 1396 (9th Cir 1991). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons." Murray v Heckler, 722 F2d 499, 502 (9th Cir 1983).

In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis: (1) the analysis required by Cotton v Bowen, 799 F2d 1403 (9th Cir 1986); and (2) an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms. Smolen v Chater,

12

80 F3d 1273, 1281 (9th Cir 1996).  "The Cotton test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairments could reasonably be expected to (not that it did in fact) produce some degree of symptom."  Id at 1282.

### B

In her appeal, plaintiff argues that the "finding of no 'severe impairment' was not supported by substantial evidence" and, specifically, that "the ALJ failed to give any reason for rejecting the opinion of a treating doctor."  Pl Mot at 4, 5.

As an initial matter, there appears to be little support in the record for the idea that plaintiff's alleged depression ever met the listing criteria for establishing disability at 20 CFR Part 404, Subpart P, Appendix 1 § 112.00.  Even if considered in combination with the headaches, the medical evidence does not point to depression as a significant factor affecting plaintiff's ability to work.  At most, the depression appears secondary.  The ALJ's decision with respect to plaintiff's alleged depression is supported by substantial evidence and is therefore upheld.

The court next considers plaintiff's challenge to the ALJ's handling of the evidence of migraine headaches.  Plaintiff contends that the ALJ did not give adequate reasons for rejecting and/or ignoring the evidence from treating physicians Watanabe, Keller and Harter and her own testimony in determining that plaintiff's migraines were "not severe."  The court agrees.

A substantial hurdle plaintiff faced in attempting to establish disability for SSI eligibility purposes was that migraine

headaches cannot be evidenced by imaging studies, laboratory tests or other ordinary "objective" evidence. Indeed, SSR 96-7p, which offers guidance for "assessing the credibility of an individual's statements," states "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signed and laboratory findings demonstrating the existence of a medically determinable * * * impairment that could reasonably be expected to produce the symptoms." The Act, however, does not require diagnostic tests, but allows the determination of a medically determinable impairment by means of "medically acceptable clinical and laboratory diagnostic techniques." 42 USC § 423(d)(3). This use of the disjunctive leaves little doubt that "clinic diagnostic techniques" are a legally acceptable substitute for laboratory diagnostic techniques.

   A further hurdle plaintiff faced was that the occurrence of cyclical, severe headaches does not match up with the checklists or forms used for determining residual functional capacity (RFC) in the social security context. For example, Dr Sharma's evaluation found plaintiff fully able to push, pull, stand and so on, but simply did not address the impact of severe headaches on her ability to work. AR 144. The ALJ nonetheless relied on Dr Sharma's finding of no restrictions without acknowledging the fact that the evaluation was not designed to –– and did not –– take into account plaintiff's severe, recurring pain from migraine headaches.

   Yet migraine headaches are a common malady that are readily diagnosed through the evaluation of symptoms. They are difficult to control with or without medication. According to the

14

1  current on-line version of the Merck Manual, twenty-four million
2  Americans suffer from migraines and diagnosis "is based on the
3  symptom patterns when there is no evidence of intracranial
4  pathologic changes. * * * No diagnostic tests are useful, except to
5  exclude other causes."  Other relevant information includes the
6  following:

> The cause is unknown, and the pathophysiology is
> not fully understood. Changes in brain and scalp
> arterial blood flow occur * * *.  The inflammation
> leads to irritation of perivascular trigeminal
> sensory fibers.  A cascade of events follows,
> causing changes in blood flow and the severe
> headache.
>
> The mechanism for migraines is not well defined,
> but several triggers are recognized.  Cycling
> estrogen, a significant trigger, may explain why
> there are three times as many women with migraines
> as men. Evidence of estrogen's role as a trigger
> includes the following: During puberty, migraine
> becomes much more prevalent in females than in
> males; migraines are particularly difficult to
> control in the premenopausal period; and oral
> contraceptives and estrogen replacement therapy
> often make migraine worse.  Other triggers include
> insomnia, barometric pressure change, and hunger.

http://www.merck.com/mrkshared/CVMHighLight?file=/mrkshared/mmanual/section14/chapter168/168b.jsp%3Fregion%3Dmerckcom&word=migraine&domain=www.merck.com#hl_anchor (August 30, 2006).

       At least one other court, moreover, has overturned an ALJ's
determination that migraine headaches may not constitute a "severe
impairment" where the claimant displayed classic migraine symptoms
but had a normal MRI, CT scan and opthalmological examination.  In
Federman v Chater, 1996 WL 107291 (SDNY 1996), the court held
"[b]ecause there is no test for migraine headaches, 'when presented
with documented allegations of symptoms which are "entirely
consistent with the symptomatology" for evaluating [migraine], the

15

Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence.'"  See generally, B Samuels, <u>Social Security Disability Claims: Practice & Procedure</u>, § 22:63 at 22-201 and n 17  (Clark Boardman Callaghan, 2nd ed rev 2000) regarding proof of chronic fatigue syndrome, migraine, somatoform and like disorders which cannot be established through laboratory or imaging tests.

The three doctors who treated plaintiff during the period in question relied on her reports of severe headaches and treated her accordingly.  The treatments were not occasional or incidental to other medical problems.  The evidence shows that plaintiff sought treatment for migraine headaches as a chief medical complaint over the entire period and that her quest for relief from these headaches was at least part of the reason for her decision to undergo a hysterectomy.  The fact that post-hysterectomy, plaintiff's migraines gradually became less severe, moreover, is consistent with the medical literature cited above.  Furthermore, while, as noted above, there was not and could not be laboratory or imaging test results in the record establishing unequivocally the occurrence, frequency or intensity of plaintiff's headaches, there is no medical or other evidence in the administrative record casting doubt on whether plaintiff experienced them or suggesting that she was malingering.

The opinion of a treating physician may be rejected only for "clear and convincing" reasons.  <u>Lester</u>, 81 F3d at 830.  The sole reason provided by the ALJ for ignoring the evidence provided by plaintiff's treating physicians was that he could not "reasonably infer limitations" from the medical evidence.  Instead, "[i]n

16

finding no 'severe' impairment, I give weight to the assessments of State Agency Medical consultant [sic] which find no significant physical or mental limits."  Moreover, while hysterectomy may be a common procedure, the ALJ's characterization of it as "minor" was unreasonable.

"Where the [ALJ] fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'"  <u>Lester</u> 81 F3d at 834; quoting <u>Hammock v Bowen</u>, 879 F2d 498, 502 (9th Cir 1989).

The ALJ not only ignored or discredited treating physician evidence, he discredited plaintiff's own testimony in a manner that was erroneous as a matter of law.  This appeal turns largely on the apparent disparity between plaintiff's testimony about her subjective pain symptoms and the ALJ's conclusion of "no severe impairment" at step two of the five-step sequential analysis.

"It is improper as a matter of law to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings."  <u>Cotton</u>, 799 F2d at 1407.  The law governing the ALJ's responsibilities in cases involving excess pain is well-developed in this circuit.  "Excess pain" is "pain at a level above that supported by medical findings." <u>Chavez v Department of Health and Human Services</u>, 103 F3d 849, 853 (9th Cir 1996).  If a claimant is able to produce objective medical evidence of an underlying impairment, an ALJ may not reject his subjective complaints based solely on lack of objective medical evidence to corroborate the alleged severity of pain.  <u>Moisa v Barnhart</u>, 367 F3d 882, 885 (9th Cir 2004).  If the ALJ finds the claimant's pain testimony not to be credible, the ALJ "must

17

specifically make findings that support this conclusion." Id. Absent "affirmative evidence that the claimant is malingering," the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony regard the severity of symptoms. Id.

The ALJ did not give "clear and convincing" reasons for discrediting plaintiff's subjective pain testimony. The administrative record contains no evidence of malingering and plaintiff's extensive medical records relating to migraine headaches are in direct contradiction to the ALJ's statements downplaying their severity. Contrary to the ALJ's findings, if plaintiff and her treating physicians are to be believed, her severe, cyclical migraine headaches "significantly limit[ed her] physical or mental ability to do basic work activities," 20 CFR § 416.921(a), having more than a "minimal" effect on her ability to work.

In summary, the ALJ erred at step two by rejecting or failing to give proper weight to the treating physicians' and examining physicians' reports and by improperly rejecting plaintiff's own testimony. Where the ALJ improperly rejects the opinion of a treating or examining physician, that opinion is credited "as a matter of law." Lester, 81 F3d at 834. Thus crediting the disregarded evidence, and taking into account the evidence in the record as a whole, the court finds that substantial evidence in the record compels a finding that plaintiff had a "severe impairment" from August 20, 1996 until sometime after her recovery from her hysterectomy in 1998. Unfortunately, because the ALJ incorrectly found that plaintiff never had a severe impairment, he did not attempt to identify the date upon which plaintiff's migraine-related severe impairment ended.

18

The next step would be to determine whether plaintiff's condition met or equaled a listed impairment in 20 CFR Part 404, Appendix 1.  Plaintiff's migraine headaches, however, are not among the listed impairments.  "Not all possible medical conditions, diseases, or ailments are contained in the Listings.  The Listings are selective, not exhaustive.  Many serious and potentially disabling impairments are not found in the Listings[,] * * * only the most frequently diagnosed impairments."  B Samuels, <u>Social Security Disability Claims: Practice & Procedure</u>, § 22:74 at 22-215.  The inquiry would then move to step four, at which plaintiff must show that she could not perform her past relevant work —— i e, her job as bank teller.

### III

This matter is remanded to the Social Security Administration for reconsideration beginning at step four of the five-step sequential analysis, 20 CFR § 416.920.  The clerk shall enter judgment in favor of plaintiff and against defendant and shall close the file.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge